Douglas CHAPPEE, Petitioner,

v.

COMMONWEALTH OF
MASSACHUSETTS,
Respondent.

Civ. A. No. 86–2600–Y.

United States District Court,
D. Massachusetts.

March 18, 1987.

Douglas D. Chappee, pro se.

Kimberly Homan, Boston, Mass., for petitioner.

Frances Robinson, Asst. Atty. Gen., Criminal Bureau, Boston, Mass., for respondent.

## MEMORANDUM AND ORDER ON THE PETITION FOR HABEAS CORPUS

YOUNG, District Judge.

In this petition for a writ of habeas corpus, the petitioner, Douglas Chappee ("Chappee"), challenges the exclusion by the court of three expert defense witnesses in his criminal trial in the Massachusetts Superior Court. Chappee argues that he was denied his Sixth and Fourteenth Amendment right to present a defense. This Court rules that the exclusion of the expert witnesses by the justice of the Massachusetts Superior Court violated Chappee's constitutional rights and the petition for issuance of the writ of habeas corpus is therefore granted as modified.[1]

## BACKGROUND

On October 26, 1984, Chappee was convicted of trafficking in cocaine in violation of Mass.Gen.Laws ch. 94C, § 32E(b)(2) (1984), and possession of cocaine with intent to distribute in violation of Mass.Gen. Laws ch. 94C, § 32A(a) (1984). Chappee was sentenced to a term of imprisonment of not less than five nor more than ten years and is currently incarcerated at the Massachusetts Correctional Institution, Norfolk. The Massachusetts Supreme Judicial Court affirmed the trafficking conviction and remanded the possession conviction to the Superior Court for the entry of an order of dismissal on the grounds that possession with intent to distribute is a lesser included offense of trafficking. *Commonwealth v. Chappee*, 397 Mass.

---

1. Chappee also raises an ineffective assistance of counsel claim. In light of the Court's hold-ing, it is unnecessary to address that claim.

508, 492 N.E.2d 719 (1986). In this petition, Chappee challenges the trafficking conviction.

At the trial, the Commonwealth called three witnesses. The first witness was Kenneth Gagnon, a chemist with the Massachusetts Department of Public Safety. Gagnon had analyzed and prepared a certificate of analysis on the white powder seized from the defendant's home. Defense counsel (not Chappee's counsel in this proceeding) had an opportunity to cross-examine Gagnon with respect to the difference between "Cocaine L," a controlled substance within the meaning of chapter 94C, and other cocaine isomers which were not proscribed by the statute. Gagnon testified that there is a division of opinion within the scientific community as to whether the tests he performed could distinguish between different cocaine isomers.

Towards the end of cross examination of Gagnon, defense counsel indicated that he intended to present his own expert witnesses. The Commonwealth objected since the names had not been provided as required by the pretrial report. According to the pretrial report, defense counsel had agreed to provide the Commonwealth with a written list of the names and addresses of proposed witnesses on or about October 21, 1983. It is undisputed that defense counsel never filed such a list or, prior to that point in the trial, attempted to notify the Commonwealth in any other fashion of the proposed expert witnesses. The Commonwealth rested its case at about 4:00 p.m. and no further trial proceedings were contemplated for that day. In the context of discussing the proceedings for the next day, counsel for the defense again indicated that he intended to call three expert witnesses. He stated their names and addresses and suggested alternative measures to minimize any possible prejudice that the Commonwealth might suffer. The court ruled, however, that it was going to exclude all the expert defense testimony.

The following day, defense counsel made an offer of proof as to the substance of the proposed testimony. He stated that the witnesses were offered to prove that the tests performed by the Commonwealth were inadequate to distinguish between Cocaine L and the other cocaine isomers.[2] It was his contention that the testimony would have created reasonable doubt as to whether the substance examined was in fact the controlled substance charged.

## DISCUSSION

### I.

This petition raises the question of whether and under what circumstances a trial court may exclude defense witnesses in a criminal proceeding because defense counsel intentionally refrained from giving the prosecution timely notice of the witnesses' names and addresses.[3] The Sixth

---

**2.** This is hardly a frivolous defense. A government study of crime laboratory proficiency "found that over 18 percent of the chemists failed to identify the sample drug accurately." M. Saks & R. Van Duizend, *The Use of Scientific Evidence in Litigation* 8 (National Center for State Courts, 1983) (citing J. Peterson, E. Fabricant, & K. Field, Crime Laboratory Proficiency Testing Research Programs: Final Report [U.S. G.P.O.1978]). Other chemists "sometimes use tests that are suitable only for screening, not for specific identification of a substance." M. Saks & R. Van Duizend, *supra*, at 7 (citing P. Levitt & E. Guralnick, *Chemists in the Courtroom: An Interview with Professor Robert Shapiro about Drugs, Forensic Chemists, and the Law*, 3 National Journal of Criminal Defense 235–75 [1977]).

**3.** The Commonwealth asserts that *Wainright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), is a bar to consideration of this petition.

The Commonwealth's position is that *Sykes* precludes review because the alleged constitutional violation, the exclusion of the witnesses, is a result of Chappee's "failure to comply with a state procedural rule." This position is completely without merit.

In *Sykes*, 433 U.S. at 86–87, 97 S.Ct. at 2506, the Supreme Court held that when the state courts have refused to rule on the merits of a federal constitutional issue because it was not raised in accordance with state procedural rules, federal habeas corpus review is not available unless the petitioner can show "cause and prejudice." *See also Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). Thus, for example, absent a showing of cause and prejudice, a federal court cannot, in a habeas proceeding, consider the constitutionality of a jury instruction if the defendant's failure to object contemporaneously prevented the state appellate court

and Fourteenth Amendments protect a criminal defendant's right to call witnesses on his own behalf and exclusion of defense witnesses threatens that right. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *Washington v. Texas*, 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967). The Supreme Court has held, however, that the Sixth Amendment right to present a defense is not unlimited and under certain circumstances must give way to "the legitimate demands of the adversarial system." *United States v. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975). In addition, the Supreme Court has upheld, against due process and self-incrimination challenges, state discovery rules that require a defendant to give prior notice of an alibi witness, at least where the defendant receives reciprocal discovery rights. *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 55 (1970). The Supreme Court has expressly reserved, however, the question whether it is constitutional under the Sixth Amendment to enforce these discovery rules by imposing a preclusion order against a criminal defendant. *Wardius v. Oregon*, 412 U.S. 470, 472 n. 4, 93 S.Ct. 2208, 2211, 37 L.Ed.2d 82 n. 4 (1973); *Williams v. Florida*, 399 U.S. at 83 n. 14, 90 S.Ct. at 1897; *Smith v. Jago*, 470 U.S. 1060, 1061, 105 S.Ct. 1777, 1778, 84 L.Ed.2d 836 (1985) (White, J., dissenting from denial of certiorari).

In *Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the trial court precluded a defense investigator from testifying since refusal by defense counsel to provide the prosecution with a redacted copy of the investigator's report would have impeded the prosecution's ability to effectively cross examine the investigator. The Supreme Court upheld the preclusion stating that it was within the trial court's discretion "to assure that the jury would hear the full testimony of the investigator rather than a truncated portion favorable to respondent." *Id.* at 241, 95 S.Ct. at 2171. "[O]ne cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *Id.* In *Nobles*, then, the Supreme Court excluded testimony profferred without the guarantees of trustworthiness garnered from effective cross examination in order to preserve the integrity of the trial's truth seeking process.

Unlike *Nobles*, in many cases the failure of defense counsel to comply with discovery rules is unrelated to the probative value of the evidence. Exclusion under these circumstances "may lead to an unfair conviction." 2 ABA Standards for Criminal Justice § 11–4.7(a) (2d ed. 1980) ("The exclusion sanction is not recommended because its results are capricious"). The Fifth Circuit has addressed this problem by adopting an absolute rule against the exclusion of evidence to enforce discovery rules. *United States v. Davis*, 639 F.2d 239, 243 (5th Cir.1981). Several commentators have taken the same position. *See, e.g.,* 2 ABA Standards for Criminal Justice § 11–4.7(a) (2d ed. 1980); Westen, *The Compulsory Process Clause*, 73 Mich.L. Rev. 71, 137–39 (1974); Note, *The Preclusion Sanction—A Violation of the Constitutional Right to Present a Defense*, 81 Yale L.J. 1342, 1364 (1972).

Other courts have balanced the government's interest in enforcing discovery rules against the defendant's Sixth Amendment right to call witnesses in its favor. *See Fendler v. Goldsmith*, 728 F.2d 1181, 1187–88 (9th Cir.1984); *Alicea v. Gagnon*, 675 F.2d 913, 923 (7th Cir.1982); *Brauns-*

from considering the matter. *Sykes* is a case about federalism and the significant societal costs that the Great Writ imposes. *Id.* at 88–91, 97 S.Ct. at 2507–09. *Sykes* and its progeny stand for the proposition that where the state courts are deprived of the opportunity to cure the error themselves, through a defendant's procedural default, the cost of allowing federal intervention outweighs the benefits. *Id.*

Neither the concerns articulated in *Sykes* nor its holding are applicable to this case. The

Supreme Judicial Court considered Chappee's Sixth Amendment claim and rejected it on the merits. The Commonwealth is incorrect when it states that Chappee's plight came about as a result of his "procedural default," i.e., his failure to abide by the discovery agreement. Chappee is attacking the rule itself. His claim is that the Massachusetts rules are unconstitutional insofar as they allow the exclusion of the defense witnesses under the circumstances of this case.

*kill v. Hilton,* 629 F.Supp. 511, 522–23 (D.N.J.), *aff'd,* 808 F.2d 1515 (3d Cir.1986); *United States ex rel. Enoch v. Lane,* 581 F.Supp. 423, 431–32 (N.D.Ill.1984), *aff'd sub nom., United States ex rel. Enoch v. Hartigan,* 786 F.2d 161 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986); *United States ex rel. Robinson v. McGinnis,* 593 F.Supp. 175, 181–83 (C.D.Ill.1984), *aff'd,* 753 F.2d 1078 (7th Cir.1985), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985); *Hackett v. Mulcahy,* 493 F.Supp. 1329, 1340 (D.N.J.1980). The factors generally considered by these courts include: (1) whether the discovery violation was willful or in bad faith; (2) the materiality of the evidence excluded; (3) the extent to which the prosecution will be surprised or prejudiced; (4) the effectiveness of less severe sanctions; and (5) whether the defendant himself knew of or cooperated in the discovery violation.[4]

The First Circuit has not addressed this precise issue but *Blaikie v. Callahan,* 691 F.2d 64 (1st Cir.1982) is a similar case. In *Blaikie,* the Massachusetts Superior Court had refused to allow the defense to reopen its case in order to present two expert witnesses. The First Circuit affirmed the district court's denial of a petition for habeas corpus, making it clear that it considered a refusal to reopen the case a substantially different question than a refusal to receive evidence offered in the regular course of trial. *Id.* at 67. The court held that a greater degree of prejudice must be shown under these circumstances and not-

ed that "the core concerns of the sixth amendment [were] not at stake in this case." *Id.* at 68 n. 3. While *Blaikie* is clearly a different case, the First Circuit's aproach suggests that this Court should apply the balancing test to the present case.

## II.

### A. *Standard of Review*

This Court is well aware that with respect to habeas petitions, the scope of review of state court determinations by federal courts is limited, *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (hereinafter *"Sumner* I"), and this Court accords the greatest respect to the courts of the Commonwealth.[5] It is the role of the federal courts, however, to review state court decisions when defendants challenge those decisions under the Constitution and the laws of the United States. *Id.* at 543, 101 S.Ct. at 767. "It has long been established, as to those constitutional issues which may properly be raised under [28 U.S.C. § 2254], that even a single federal judge may overturn the judgment of the highest court of a State insofar as it deals with the application of the United States Constitution or laws to the facts in question." *Id.* at 543–44, 101 S.Ct. at 767. It is also important to note that while the factual findings of the state court are entitled to a presumption of correctness, several courts have held that the Sixth Amendment also requires a presumption against exclusion of defense evidence. *Fendler,* 728 F.2d at 1188; *Enoch,* 581 F.Supp. at 432.

---

**4.** While courts have not specifically included the defendant's complicity in their lists of factors, several courts have discussed its importance and have found the absence of complicity a persuasive ground for finding reversible error. *Fendler,* 728 F.2d at 1187; *Braunskill,* 629 F.2d at 523; *Enoch,* 581 F.Supp. at 430; *Hackett,* 493 F.Supp. at 1336. This Court considers it to be an important factor.

**5.** In the interest of full disclosure, it is appropriate to note that I first came to the bar as law clerk to the Hon. Raymond J. Wilkins, one of Massachusetts' most distinguished and learned jurists, then Chief Justice of the Massachusetts Supreme Judicial Court. Later, I served for over eight years as a justice of the Massachusetts Superior Court and consider it among the

finest jury trial courts in the United States. The justice of the Superior Court who presided over Chappee's trial is one of the most meticulous, considerate, and scholarly judges I have known. He was a mentor of mine when I joined that court. Naturally, none of these associations has the slightest bearing on the constitutional analysis in which this Court must engage. I have carefully reflected on whether these prior associations affect in any way the determinations made herein. I conclude they do not. Indeed, the responsibility of this Court is akin to that of any trial judge who, in a different judicial position, must review the conclusions of a colleague or former colleague. This is hardly a general ground for recusal. *See* 28 U.S.C. § 292 (1982).

Under 28 U.S.C. § 2254(d) (1982), a state court determination of factual issues is entitled to a presumption of correctness by the federal courts unless one of seven enumerated conditions exists or the federal court concludes, after reviewing the state court record, that the state court's determination is not "fairly supported by the record." [6] In addition, in accordance with the Supreme Court's decision in *Sumner* I, 449 U.S. at 551, 101 S.Ct. at 771, if the federal court concludes that one of the seven factors exists or that the state court determination is not fairly supported by the record, it must explicitly state its reasoning in its opinion. Finally, if none of the statutory exceptions exist, the burden is on the applicant "to establish by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d); *Judd v. Vose*, 813 F.2d 494, 495, n. 1 (1st Cir.1986).

6. 28 U.S.C. § 2254 provides in pertinent part:
(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
(1) that the merits of the factual dispute were not resolved in the State court hearing;
(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) that the material facts were not adequately developed at the State court hearing;
(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
(7) that the applicant was otherwise denied due process of law in the State court proceeding;
(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of

## B. *Balancing test*

### 1. *Superior Court*

Adopting the balancing test discussed above at pages 1222 and 1223, this Court first balances the relevant factors in light of the record of the Superior Court proceedings. First, the Superior Court specifically found that defense counsel acted in bad faith. "I find as a matter fact that the defense has not acted in good faith; that it has deliberately withheld the names of these expert witnesses for the purpose of lulling the Commonwealth into security ... and creating unfair prejudice to the disadvantage of the Commonwealth in this case." This finding has ample support in the record. It is quite clear that actions of the defense counsel were egregious and in violation of the explicit terms of the pretrial order.[7]

the evidence to support such factual determination, is produced as provided hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:
And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State Court was erroneous.

7. Indeed, such conduct by an attorney would appear to violate Massachusetts Supreme Judicial Court Rule 3:07, DR 1–102(A)(4), (5), and (6), as well as DR 7–106(c)(5) and (7). Justices of the Massachusetts courts are required by Supreme Judicial Court Rule 3:09, Canon 3(B)(3)(b), to "initiate appropriate investigative or disciplinary measures [when they] become aware of unprofessional conduct by a ... lawyer." The record here, however, is silent concerning whether the Justice of the Superior Court or the Justices of the Supreme Judicial Court initiated any such action. While it is probably duplicative of action already taken by the state courts, this matter warrants investigation. Accordingly, the Clerk of the United

With respect to the second factor—the materiality of the evidence excluded—the trial justice made no explicit finding. The inference is compelling, however, that the excluded evidence was material since the expert witnesses constituted the defendant's entire defense. It is entirely possible that the testimony would have created a reasonable doubt as to whether the substance seized was a controlled substance within the meaning of the statute. While admittedly the defendant had the opportunity to cross-examine the government's expert on the same issue, the right to present one's own defense is greater than merely the right to cross-examine the government's witnesses.

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. *Washington,* 388 U.S. at 19, 87 S.Ct. at 1923. In addition, there is no indication that the testimony of the defendant's experts was to be cumulative. *See Enoch,* 581 F.Supp. at 432. In fact, defense counsel specifically argued that his witnesses would contradict certain statements made by the government's experts. In such circumstances, cross-examination, however searching and skillful, is not and cannot be the functional equivalent of the presentation of affirmative evidence.

The third and fourth factors are the extent to which the prosecution was surprised and prejudiced, and the effectiveness of alternative sanctions. While the government clearly was surprised and there would have been some prejudice to the

government had the trial court allowed the testimony of Chappee's expert witnesses to be received at once, it is not at all clear that alternative sanctions could not have minimized the prejudice. The Ninth Circuit noted in *Fendler,* 728 F.2d at 1186 (quoting Rezneck, *The New Federal Rules of Criminal Procedure,* 54 Geo.L.J. 1276, 1294 [1966]), that "[t]here is every reason to believe that a preclusion order is no more effective than other available sanctions. Indeed, '[s]tiff disciplinary sanctions against the offending defense attorney seem a more effective deterrent.'" The court concluded that "[g]iven the availability of such alternative means of forcing compliance with discovery orders, it would seem that preclusion orders are seldom if ever truly necessary." *Fendler,* 728 F.2d at 1187.

In the present case, defense counsel was willing to agree to a continuance and to allow the government to interview the expert witnesses, call other chemists, and recall Gagnon, the Commonwealth's chemist. The record does not indicate that the trial justice considered the effectiveness of these alternatives. In fact, the judge responded to defense counsel's suggestions by pointing out that the prosecution "had been had," and that the witnesses would, therefore, be excluded. Thus his refusal to impose less severe sanctions was based not on their effectiveness, but on the egregiousness of the violation.

Finally, the Superior Court did not find— and there is nothing in the record suggesting—that there was any complicity between Chappee and defense counsel. Absent evidence of complicity, it is unreasonable to deprive a defendant of his right to present a defense, a right guaranteed to him by the Constitution of the United States, even if his attorney intentionally failed to timely provide a list of defense witnesses to the prosecution as required by the Commonwealth's rules of criminal procedure.[8]

---

States District Court for the District of Massachusetts is directed to send a certified copy of this opinion to the Massachusetts Board of Bar

Overseers for such investigation and action as it deems appropriate.

**8.** In addition, several courts have noted that if evidence may be excluded under these circum-

### 2. *Supreme Judicial Court*

In *Sumner* I, 449 U.S. at 545–46, 101 S.Ct. at 768–69, the Supreme Court held that a presumption of correctness must be accorded to the findings of state appellate courts as well as to the findings of state trial courts. The Massachusetts Supreme Judicial Court made two additional determinations that were not expressly made in the Superior Court. First, the court noted that the proffered testimony of the experts would only serve to challenge the efficacy of the Commonwealth's tests and would not constitute their own opinion as to the composition of the substance. *Commonwealth v. Chappee*, 397 Mass. at 518, 492 N.E.2d 719. Second, the court stated that "it seems highly unlikely" that alternative sanctions would have protected the Commonwealth's interests. *Id.* at 518–19, 492 N.E.2d 719.

The first question is whether these statements constitute determinations "after a hearing on the merits of a factual issue" within the meaning of § 2254(d) and, therefore, are entitled to a presumption of correctness. Questions of fact are "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators.'" *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (quoting *Brown v. Allen*, 344 U.S. 443, 506, 73 S.Ct. 397, 435, 97 L.Ed. 469 [1953] [opinion of Frankfurter, J.]). The § 2254(d) limitation does not apply to a legal determination or a mixed question of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (hereinafter *"Sumner* II").

Giving the words and phrases "facts," "factual issues," and "mixed question of law and fact" the routine and ordinary usage of the language, the Supreme Judicial Court was not "finding facts" when it commented on the materiality of the proposed testimony and the feasibility of alternative sanctions. Rather, it was drawing legal conclusions based on its interpretation of the trial proceedings.

There is no doubt but that the Supreme Judicial Court is correct in its statement that the defendant's experts were only offered "to challenge the efficacy of the Commonwealth's testing procedures" and that Chappee had the opportunity to cross-examine Gagnon on the same issue. *Commonwealth v. Chappee*, 397 Mass. at 518, 492 N.E.2d 719. Likewise, no one can reasonably quarrel with the statement of the Supreme Judicial Court that alternative sanctions would have been burdensome since any alternative would have involved the delay inherent in either receiving the testimony or re-scheduling the trial on another busy trial day. *Id.* at 518–19, 492 N.E.2d 719.[9] However, consistent with

---

stances without a showing that the defendant himself participated in the chicanery, defendants will challenge convictions on the ground of ineffective assistance of counsel. *See, e.g., supra* note 1. This simply shifts the basis for challenging the evidentiary exclusion and creates additional constitutional issues. *Fendler,* 728 F.2d at 1187; *Enoch,* 581 F.Supp. at 431.

**9.** To appreciate the magnitude of the problem facing the Superior Court justice, it is appropriate to note that in 1984, were the centralized docket of the Superior Court to be divided among its sixty sitting judges—the Chief Administrative Justice in Massachusetts is also a Superior Court justice but as he "does not sit in trial sessions there are 60 Superior Court justices available, at maximum strength," 57th Report of the Judicial Council of Massachusetts, 1986, p. 45 (remarks of Donahue, J.)—each Superior Court justice would be responsible for handling 1,290 pending civil cases and 76 pending criminal cases. For the total cases pending in the Superior Court in 1984, see Annual Report of the Massachusetts Trial Courts 139–40 (1984). (This may be compared with the 394 civil cases and 10 criminal cases presently pending in this session of the United States District Court—and this court is so notoriously lacking in judicial manpower that the Judicial Conference of the United States has recommended to Congress that two additional judgeships be created for this District). It is clear that, in attempting to manage its enormous case load the time each individual Superior Court justice spends actually presiding over and determining cases is at a premium.

It is possible to place a per day monetary cost to the taxpayer on this process of adjudication—the core "product," if you will, of the judicial branch of government. For example, it has been estimated that in 1982 the costs, including salaries, support staff, and other resources of each federal district judge, came to $752,000 annually. J. Resnik, *Managerial Judges,* 96 Harv.L.Rev. 374, 423 n. 188 (1982) (citing J.

this Court's right to assign different legal weight to facts found by the state court and its duty to determine the legal effect of the facts in light of the constitutional issues at stake, *Sumner* I, 449 U.S. at 543–44, 101 S.Ct. at 767–68, this Court respectfully disagrees with the Supreme Judicial Court's conclusions that these factors outweighed Chappee's constitutional right to call his expert witnesses.[10]

Kakalik & A. Robyn, *Costs of the Civil Justice System: Court Expenditures for Processing Tort Cases* 64 [1982] ). If 230 court days are devoted to actual adjudication (365–day year less 104 weekend days, 10 holidays, 20 vacation days, and 1 sick day) the per day cost to the taxpayer of adjudication in the federal district court comes to $3,270.

While comparable figures for the Massachusetts Superior Court are difficult to obtain due to the amalgamation of the various Massachusetts trial courts for budgetary purposes, one suspects that, given the extremely adverse conditions under which Massachusetts Superior Court justices are forced to work—*see, e.g., Sarrouf v. New England Patriots Football Club, Inc.,* Norfolk Superior Ct. No. 121012, slip op. at 12 n. 5 (April 24, 1985), *aff'd in part, rev'd in part,* 397 Mass. 542, 492 N.E.2d 1122 (1986); *Commonwealth v. Sperrazza,* Norfolk Superior Ct. No. 7772, slip op. at 18 n. 2 (December 31, 1984), *aff'd,* 399 Mass. 1001, 503 N.E.2d 648 (1987); Dispute Resolution in Massachusetts: Final Report of the Governor's Alternative Dispute Resolution Working Group 83–84 (November, 1986) (hereafter "Dispute Resolution") ( [referring to the Superior Court, this report states] "there is no adequate substitute for resources where resources are called for. Adequate secretarial assistance, office equipment, and office space are essentials that any institution must have to perform up to its capabilities. No amount of technique will paper over these deficiencies.")—the per day cost of Massachusetts Superior Court operations is considerably less. Indeed, in analyzing the economics of the judicial branch, the Massachusetts Judicial Council recently calculated the total cost of Superior Court operations in 1987 at $21,845,225. 57th Report of the Judicial Council of Massachusetts 30 (1986). Dividing this figure by the 230 day annual norm for active adjudication, and again by the 60 sitting Superior Court justices, leaves a cost to the Massachusetts taxpayer of $1,583 for each trial day in each active session of the Massachusetts Superior Court.

It must be remembered that these are the *minimum* reliable cost estimates. Fully amortizing the cost of court buildings could raise these estimates markedly. It is reliably estimated that today the per session per day cost of a session of the United States District Court is actually $10,000—$15,000. While a justice of the Superior Court, I estimated—from review of bills approved and accounts rendered—that the taxpayer cost of simultaneously running two multi-defendant trials with sequestered juries came to $15,504 per day, *See Big Dan's Tab: $504,270,* The Boston Globe, March 29, 1984, commenting on the trial in *Commonwealth v. Vieira et al,* Bristol Superior Ct. No. 12265 (appeal pending), and the taxpayer cost of a Superior Court murder trial without a sequestered jury approximated $3,000 per day. *Commonwealth v. Sperrazza,* Norfolk Superior Ct. No. 7772, slip op. at 18 (December 31, 1984), *aff'd,* 399 Mass. 1001, 503 N.E.2d 648 (1987).

If the total 1984 appropriations for the various Massachusetts trial courts, Mass.St.1984, ch. 234, line items no. 0330–0100—039–2100 inclusive, are aggregated—thus including the rental costs of the various courthouses—the total appropriation for fiscal year 1985 comes to $193,-593,101. If this sum is divided by the 281 justices of the various trial courts, Annual Report of the Massachusetts Trial Courts 13 (1985), and again by the 230 day norm for judicial sittings, the result rises to a taxpayer cost of $2,964 per Massachusetts judicial session per day.

To return to the instant case, each of the alternatives suggested by defense counsel would doubtless have involved a considerable disruption of the trial calendar in the Superior Court. At an absolute minimum, receiving the testimony of the three defense experts would involve an additional half day of trial—precious time for which the Superior Court justice could not have been expected to make provision since defense counsel, in an attempt to prejudice the Commonwealth, failed to timely notify the court of these witnesses. Indeed, the disruption of other unrelated but tightly scheduled cases would most probably involve the loss of more than one half day of trial time. In any event, the minimum cost to the Massachusetts taxpayer from the misconduct of defense counsel here may be conservatively estimated at $791.50 (i.e., one half of the per session full trial day cost of Superior Court operations).

**10.** On the issue of the feasibility of alternative sanctions, for example, it was open to the Superior Court justice to assess $791.50 or more against defense counsel as a sanction for failure to comply with the pre-trial agreement. This would serve to compensate the taxpayers of the Commonwealth for the loss defense counsel has caused them. It is also the "[s]tiff disciplinary sanction" that will effectively—and more fairly—deter attorney misconduct. *Fendler v. Goldsmith,* 728 F.2d 1181, 1186 (9th Cir.1984); Rezneck, *The New Federal Rules of Criminal Procedure,* 54 Geo.L.J. 1276, 1294 (1966).

As an aside, if the figures cited in note 9 above are anywhere near accurate, the sanctions imposed by the Court of Appeals for the First Circuit for bringing frivolous appeals, *see, e.g., Chongris v. Board of Appeals of the Town of Andover,* No. 86–176, slip op. at 7 (1st Cir. Dec. 31, 1986) (double costs and attorneys fees of

This Court considers a criminal defendant's right to present a defense as fundamental to our adversary system. In our adversary system, the determination of substantive guilt requires that an equal opportunity be afforded both the state and the accused for active partisan participation in the presentation of evidence. *See Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975). Balanced partisan advocacy serves to enhance reliable determination of guilt as well as to ensure that the accused is only found guilty through fair procedures. *See id.* The defendant's right to present a defense serves to balance the presentation of evidence by the state. *Id.* 397 Mass. at 19, 492 N.E.2d 719. Accordingly, this Court holds that when all the facts are appropriately balanced, giving proper consideration to Chappee's Sixth Amendment rights, the evidence excluded was sufficiently material and the alternative sanctions sufficiently feasible that Chappee's right to call his witnesses outweighed the Commonwealth's interest in enforcing its discovery rule.

Having reached this point in the analysis, the Court must frankly acknowledge that the Supreme Court's *Sumner* opinions give me some pause. In those cases, the defendant Mata challenged the constitutionality of a pre-trial photographic identification and the Court of Appeals for the Ninth Circuit granted the defendant's petition for habeas corpus. *Mata v. Sumner*, 611 F.2d 754, 755 (9th Cir.1979), *vacated*, 449 U.S. 539, 101 S.Ct 764, 66 L.Ed.2d 722 (1981). The Supreme Court, concluding that the findings of the Ninth Circuit were inconsistent with the findings of the state court, vacated the judgment. *Sumner* I, 449 U.S.

at 542–52, 101 S.Ct. at 766–72. The Supreme Court held that a federal court must not only accord a presumption of correctness to state court findings of fact but must provide a specific explanation as to the sub-part of § 2254(d) on which it relies if it concludes that the presumption does not apply. *Id.* at 551, 101 S.Ct. at 771. The Ninth Circuit had not provided such an explanation. *Id.* On remand, the court of appeals held that § 2254(d) was not applicable since it agreed with the factual determinations of the state court and any apparent disagreement was "over the *legal and constitutional significance* of certain facts." *Mata v. Sumner*, 649 F.2d 713, 716 (9th Cir.1981), *vacated*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). The Supreme Court again vacated and remanded the judgment holding that the determinations underlying the ultimate question of the constitutionality of the pretrial identification procedures are findings of fact. *Sumner* II, 455 U.S. at 597, 102 S.Ct. at 1306.

*Sumner* II suggests that since the issues of the materiality of the evidence and the feasibility of alternative sanctions are factors to be considered in evaluating Chappee's Sixth Amendment claim, they are factual determinations within the meaning of § 2254(d). It should be noted that the Supreme Court has recently recognized that "[i]n the § 2254(d) context, as elsewhere, the appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive." *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 451–53, 88 L.Ed.2d 405 (1985) (The voluntariness of petitioner's confession was a question of law subject to plena-

$500 assessed); *Kelley v. United States,* 789 F.2d 94, 98 (1st Cir.1986) (double costs assessed); *Sullivan v. United States,* 788 F.2d 813, 816 (1st Cir.1986) (double costs assessed); *Gianfriddo v. Western Union Telegraph Company,* 787 F.2d 6, 7 (1st Cir.1986) (double costs and attorney's fees of $500 assessed), either substantially undervalue that Court's contribution to the judicial process or reflect the view that much lighter sanctions than those discussed here are effective to deter attorney misconduct. If the latter, such view confirms the conclusion drawn here that a brief continuance, or the like, coupled with a

monetary sanction would have been feasible and effective. *Compare* the sporadic and generally light sanctions imposed in civil cases in the Superior Court, Dispute Resolution, *supra* at 27–28, *with* the recent admonition by the American Bar Association that judges should impose sanctions for the abuse of the litigation process. "…. In the Spirit of Public Service:" A Blueprint for the Rekindling of Lawyer Professionalism, A.B.A. Comm. on Professionalism 42 (1986) (noting indications that federal courts are making increased use of Federal Rules of Civil Procedure 11 and 26 to impose sanctions).

ry federal review). *Miller* does, however, provide some pertinent guidance.

> [T]he fact/law distinction at times has turned on a determination that, as a matter of sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.... When, for example, the issue involves the credibility of witnesses and therefore, turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight.

*Id.* at 451.

While the Supreme Court clearly did not intend this to be the determinative test, this Court, informed by *Miller*, concludes that the additional comments of the Supreme Judicial Court in *Commonwealth v. Chappee*, 397 Mass. at 518–19, 492 N.E.2d 719, were in no sense "findings of fact." This conclusion is consistent with the Supreme Judicial Court's own view of its role as an appellate court. "Appellate courts are not fact finders. 'The duty of weighing evidence and of finding facts ... in an action at law is not an appropriate function of [an appellate] court....'" *Director of the Division of Employment Security v. Town of Mattapoisett*, 392 Mass. 858, 862 n. 5, 467 N.E.2d 1363 n. 5 (1984) (quoting *Atlantic Maritime Co. v. Gloucester*, 228 Mass. 519, 522 [1917]).[11]

Even were these determinations—contrary to Massachusetts practice and the conclusion of this Court—considered factual determinations, it is clear that neither "finding" is "fairly supported by the record," 28 U.S.C. § 2254(d)(8), and therefore neither is entitled to a presumption of

correctness. In light of the fact that the expert witnesses were Chappee's entire defense and in view of the offer of proof that the affirmative expert testimony was not cumulative and was designed to illustrate that the chemical tests were inadequate to isolate the isomer of cocaine rendered contraband by the Massachusetts statutes, the conclusion that the profferred testimony was not material—if it be thought of as a "finding"—is contrary to the record considered as a whole and cannot be considered as "fairly supported" by that record. 28 U.S.C. § 2254(d)(8). Likewise, the record is wholly devoid of any support for the conclusion that nothing short of absolute exclusion of all the defense evidence could have remedied the prejudice to the Commonwealth during this two day non-jury trial. No doubt the Supreme Judicial Court well understood the costs imposed on the public by this type of chicanery and perceived the need to deter this type of conduct,[12] but absent a showing of complicity on a defendant's part, deterrence must be achieved by penalizing the lawyers, not by convicting their clients.

In conclusion, this Court agrees with the Superior Court and the Supreme Judicial Court of the Commonwealth of Massachusetts that defense counsel acted in bad faith and that the Commonwealth was completely surprised by Chappee's expert witnesses. If the additional determinations of the Supreme Judicial Court as to the materiality of the evidence and the feasibility of alternative sanctions are, contrary to the practice of that court, considered "findings," neither is fairly supported by the record and therefore, under § 2254 (d)(8) neither is entitled to a presumption of cor-

---

**11.** Massachusetts appellate courts can find additional facts not found by the trial court only if the additional facts are evident from the relevant portions of the transcript and if they are not in conflict with the trial court's findings. *See Bruno v. Bruno*, 384 Mass. 31, 35–36, 422 N.E.2d 1369 (1981); *Blackwell v. E.M. Helides, Jr., Inc.*, 368 Mass. 225, 226, 331 N.E.2d 54 (1975); *Hutchinson v. Hutchinson*, 6 Mass. App.Ct. 705, 707–08 (1978); *see also* Smith & Zobel, Massachusetts Rules Practice, Massachusetts Practice Series Vol. 8, § 52.6–52.7 (1977 &

Supp.1986). This Court does not believe that the Supreme Judicial Court thought that when it made additional determinations it was "finding facts" since there is nothing in the record with respect to the materiality of the excluded evidence and the feasibility of alternative sanctions from which the Supreme Judicial Court could have made such additional findings.

**12.** *See supra* notes 9 and 10.

rectness. This Court concludes, upon an examination of the record as a whole, that the proffered evidence was material in nature and, in light of the fact that this was a two day, non-jury trial, alternative sanctions were feasible and, though costly,[13] would have eliminated any undue prejudice to the Commonwealth, especially since such additional costs may be recovered from offending attorneys. Therefore, it was an error of constitutional dimension for the Massachusetts courts to refuse to hear Chappee's defense.

### C. *Harmless Error*

Finally, since this Court has held that substantial constitutional rights have been denied by the refusal to accord a hearing to Chappee's affirmative evidence, it must determine if this error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). It cannot be said that the exclusion of the expert witnesses was harmless beyond a reasonable doubt. The witnesses constituted Chappee's entire defense and if credible could have created a reasonable doubt as to the nature of the substance seized.

Accordingly, the petition for writ of habeas corpus is granted and the writ will issue unless Chappee is permitted to file a motion for a new trial and such motion is granted, all within sixty days of the date of this order.

---

**13.** Any feasible alternative sanction, however, would not be as costly as the $3900 taxpayer cost necessarily involved, at a minimum, in re-trying this two and one-half day jury waived case.